**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 9, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

SCOTT FREDRICK ARTERBURY,

      Defendant - Appellant.

No. 18-5085

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:18-CR-00056-CVE-1)**
_____

J. Lance Hopkins, Tahlequah, Oklahoma, for Defendant-Appellant.

Jeffrey A. Gallant, Assistant United States Attorney (R. Trent Shores, United States
Attorney with him on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee.
_____

Before **LUCERO**, **MATHESON**, and **PHILLIPS**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

The federal government twice charged Scott Fredrick Arterbury with the same

crime for the same possession of child pornography. In the original prosecution, the

district court suppressed the child-pornography evidence seized from Arterbury's

personal computer. The government appealed the suppression order but withdrew its

appeal without filing a brief. Once back in district court, the government obtained an order dismissing the case without prejudice. Eight months later, in a case involving a defendant in a different state, this court reversed an order suppressing child-pornography evidence obtained in reliance on the same FBI search warrant as at issue in Arterbury's case. Armed with this decision, the government re-indicted Arterbury on the original child-pornography charge. Arterbury argued that the court was bound by collateral estoppel[1] to enforce its earlier order suppressing the evidence. But the court disagreed and later denied the motion to suppress on the merits. We conclude that the district court erred in its analysis of criminal collateral estoppel. Accordingly, we vacate its order denying Arterbury's motion to enforce the original suppression order, and we remand for the court to enforce its earlier suppression order.

## BACKGROUND

**I.**   *Arterbury I*

In 2015, the FBI seized an internet server used to operate a child-pornography website known as PlayPen. The FBI loaded the PlayPen server's contents onto the FBI's server located in the Eastern District of Virginia. The FBI planned to operate the website to identify PlayPen's visitors. But the FBI soon encountered an obstacle: PlayPen ran on the Tor network, which blocked the Internet Protocol (IP) addresses of its visitors.

---

[1] Though the more modern term is "issue preclusion," we use "collateral estoppel" to be consistent with the usage of the district court and parties.

The FBI had its own software to overcome this difficulty. The FBI's software could surreptitiously install malware on the computer of any PlayPen visitor. The malware would then obtain the visiting computer's IP address and relay it back to the FBI. But because this activity would amount to a search of the user's computer, the FBI needed a search warrant.

The FBI obtained the needed search warrant from a magistrate judge in the Eastern District of Virginia. Backed by the search warrant, the FBI soon installed its software and placed its malware on the computers of PlayPen-website visitors. After doing so, the FBI retrieved the IP addresses of hundreds of PlayPen visitors, including a visitor (later determined to be Arterbury) who had logged on to the PlayPen site several times between February 20 and March 4, 2015. The FBI issued a subpoena to this visitor's internet provider to obtain the physical address associated with the IP address. In this way, the FBI learned the account holder's street address in Broken Arrow, Oklahoma.

With the street address in hand, an FBI agent sought a second search warrant, this time from a magistrate judge in the Northern District of Oklahoma. This warrant authorized a search for child-pornography evidence at the Broken Arrow residence located at that street address. In issuing the search warrant, the court relied on the agent's affidavit, which included key information obtained from execution of the Virginia magistrate's search warrant. For instance, the agent's affidavit represented that a person using an IP address associated with the Broken Arrow street address had logged on to the PlayPen site several times during the FBI's investigation. An

3

Oklahoma magistrate judge issued the search warrant. In executing the search warrant, the FBI found 3,500 images and 270 videos of child pornography on Arterbury's computer.

On December 7, 2015, a grand jury sitting in the Northern District of Oklahoma returned an indictment charging Arterbury with a single count of possession of child pornography. *See* 18 U.S.C. § 2252(a)(4)(B), (b)(2). Before the trial date, Arterbury filed a motion to suppress, arguing that the "magistrate judge in Virginia exceeded her authority under Fed. R. Crim. P. 41 by issuing a warrant for property outside her jurisdiction." R. Vol. I at 39. When the Virginia magistrate judge issued the search warrant, Rule 41 permitted magistrate judges to issue "a warrant to search for and seize a person or property located within the [magistrate's] district." [2] *Id.* at 42 (quoting Fed. R. Crim. P. 41(b) (2015)). Arterbury noted that the FBI had searched in Oklahoma when it installed malware on his computer and obtained his IP address. Thus, Arterbury claimed, the Virginia magistrate judge's warrant was void *ab initio* for authorizing a search of property outside the Virginia magistrate judge's jurisdiction.

The federal district court assigned Arterbury's motion to suppress to a magistrate judge, who, after a hearing, recommended granting the motion. The district court adopted the magistrate's recommendation and suppressed the evidence.

---

[2] Rule 41 has since been amended to permit a magistrate judge to issue a search of electronic storage media outside the magistrate's district if certain conditions are met. *See* Fed. R. Crim. P. 41(b)(6) advisory committee's note to 2016 amendment.

Relying on Rule 41, the district court ruled that the Virginia magistrate judge's search warrant was void *ab initio*. Additionally, the court ruled that the second search warrant—that is, the Oklahoma search warrant for Arterbury's home—was likewise void, because it "would not have occurred had Rule 41(b) been followed." *See id.* at 54. Finally, the court ruled that the *Leon* good-faith exception did not apply, because the search warrant was void *ab initio*. *Id.* at 55–58 (citing *United States v. Leon*, 468 U.S. 897 (1984) (holding that suppression is unwarranted when officers have acted in "good faith" in relying on a defective search warrant)). In sum, the court suppressed the evidence obtained under both the Virginia magistrate's search warrant and the later Oklahoma search warrant.

On July 27, 2016, the government filed a notice of interlocutory appeal. But before any briefing, the government chose to dismiss its appeal. This court granted the government's motion and dismissed the appeal under 10th Cir. R. 46.3(C). The government then moved the district court to dismiss the indictment without prejudice. On November 11, 2016, the district court granted the government's motion.

## II.    *United States v. Workman*

As Arterbury's prosecution sputtered to a dismissal and then lay dormant for months, the United States Attorney for the District of Colorado was prosecuting another man, Andrew Workman, on a child-pornography-possession charge also arising from the FBI's PlayPen sting. *United States v. Workman*, 863 F.3d 1313, 1315–16 (10th Cir. 2017). In Arterbury's wake, Workman filed a motion to suppress,

5

arguing that the search warrant issued by the Virginia magistrate judge had violated Rule 41. *Id.* at 1316–17.

On September 6, 2016, the district court granted Mr. Workman's motion and suppressed the evidence. *United States v. Workman*, 205 F. Supp. 3d 1256, 1259 (D. Colo. 2016), *rev'd*, 863 F.3d 1313 (10th Cir. 2017). Lacking any Tenth Circuit precedent on this issue, and partly relying on the district court's decision in *Arterbury I*, the district court concluded that the Virginia magistrate's warrant had violated Rule 41(b) of the Federal Rules of Criminal Procedure. *Id.* at 1266–67. The court also concluded that the *Leon* exception did not apply, after deeming the magistrate's warrant to be void *ab initio*. *Id.* at 1267. The government appealed the district court's order, and this time it (the U.S. Attorney's Office for the District of Colorado) maintained the appeal to a final decision from this court. *Workman*, 863 F.3d at 1321.

On appeal, this court reversed the district court's order suppressing the evidence. *Id.* We applied the *Leon* exception to the Virginia magistrate's warrant. *Id.* at 1317–18. We assumed without deciding that "the magistrate judge in the Eastern District of Virginia lacked authority to issue the warrant" and that the "resulting search was unconstitutional." *Id.* at 1317 (citing *United States v. Potts*, 586 F.3d 823, 832 (10th Cir. 2009)). Even so, we concluded that Supreme Court precedent foreclosed Mr. Workman's argument that the *Leon* exception did not apply to a warrant that was void *ab initio*. *Id.* at 1318. In support, we cited two Supreme Court cases applying the *Leon* exception when officers, acting in good faith, had relied on expired warrants mistakenly listed as active. *Id.* (citing *Herring v. United States*, 555

6

U.S. 135 (2009); *Arizona v. Evans*, 514 U.S. 1 (1995)). Because the Supreme Court had applied the *Leon* exception in those circumstances, we concluded that its precedent "require[d] us to apply the *Leon* exception even if we were to conclude that the warrant had exceeded geographical constraints." *Id.* at 1319. We therefore instructed the district court to deny Mr. Workman's suppression motion and proceed with the case. *Id.* at 1321.

### III. *United States v. Arterbury* (*Arterbury II*)

On March 7, 2018, almost nine months after our decision in *Workman* and more than fifteen months after the district court dismissed Arterbury's case, the government obtained a second indictment from an Oklahoma grand jury, recharging Arterbury with the original child-pornography offense. Arterbury filed a motion requesting that the district court enforce its earlier suppression order. According to Arterbury, the doctrine of criminal collateral estoppel barred the government from relitigating the suppression issue.

The district court denied Arterbury's motion. In doing so, the court noted that the Supreme Court has ruled that the Fifth Amendment's Double Jeopardy Clause incorporates some collateral-estoppel principles. *United States v. Arterbury* (*Arterbury II*), 322 F. Supp. 3d 1195, 1200 (N.D. Okla. 2018) (citing *Ashe v. Swenson*, 397 U.S. 436, 442 (1970)). But because jeopardy had not attached in Arterbury's original prosecution, the court deemed the "operative question" as "whether criminal collateral estoppel has a source other than the Double Jeopardy Clause." *Id.* Relying on a string of four cases, the court ruled that it could apply a

7

"due process-oriented, federal rule of criminal collateral estoppel." *Id.* at 1201 (citing *Ashe*, 397 U.S. at 443; *United States v. Oppenheimer*, 242 U.S. 85 (1916); *United States ex rel. DiGiangiemo v. Regan*, 528 F.2d 1262 (2d Cir. 1975); *United States v. Evans*, 655 F. Supp. 243 (E.D. La. 1987)).

Having gotten that far, the court defined the issue before it as one "of first impression, whether the due process-oriented, federal rule of criminal collateral estoppel bars [the government] from reprosecuting Arterbury in spite of Workman—i.e. a statement of controlling authority that overruled the legal basis upon which an earlier motion to suppress was granted." *Id.* at 1203 (some emphasis removed). Generally, the court noted that collateral estoppel "bars relitigation between the same parties of issues actually determined at a prior, separate proceeding." *Id.* at 1200 (citing *Ashe*, 397 U.S. at 442).

Though the government apparently did not contest that Arterbury could show that much, it argued that the court should apply an exception to collateral estoppel for intervening changes in the law. *Id.* at 1199. The court rejected the proposed exception, observing that the government had offered no authority that a criminal collateral estoppel even has such an exception. *Id.* at 1203 (pointing out that no such exception applies to collateral estoppel when applied as part of a Double Jeopardy Clause analysis). Nor has the government cited supporting authority on appeal. And even if it had, it would not matter. After all, the pertinent law did not change here. On that point, we are concerned with "whether . . . *legal principles* have changed significantly." *Montana v. United States*, 440 U.S. 147, 155 (1979) (emphasis added);

8

*see also Klein v. Comm'r*, 880 F.2d 260, 263 (10th Cir. 1989) (asking whether "legal principles have changed significantly" (citing *Montana*, 440 U.S. at 153–55)). In our case, the legal principle at issue is good-faith reliance on a search warrant under *Leon*. The same *Leon* rule applied to the original Arterbury prosecution as applied in *Workman*. *See Bryant v. Merit Sys. Prot. Bd.*, 878 F.3d 1320, 1327–28 (Fed. Cir. 2017) (evaluating an asserted change in law based on whether "pursuing a certain course of action was unavailable or otherwise futile under the then-controlling precedent" (citing *Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971))).

Having disposed of the change-in-law argument, the court was left to decide only whether Arterbury had satisfied the "due process-oriented, federal rule of criminal collateral estoppel." *Arterbury II*, 322 F. Supp. 3d at 1203. Here, the court said that the question "boils down to this: is it fundamentally unfair to defendant, in light of Workman, for the Court to allow [the government] to reprosecute Arterbury?" *Id.* To aid in resolving this question, the court looked to six "basic aims of the due-process oriented, federal rule of criminal collateral estoppel": "(1) reducing the chance that relitigation of an acquitted act could result in the conviction of an innocent defendant; (2) promoting finality; (3) promoting judicial economy; (4) denying the prosecution the opportunity to improve its case for a second trial; (5) preventing prosecutorial harassment; and (6) preventing prosecutorial forum shopping." *Id.* at 1203–04 (citing *Evans*, 655 F. Supp. at 245; Note, *The Due Process Roots of Criminal Collateral Estoppel*, 109 Harv. L. Rev. 1729, 1732–33 (1996)).

9

After considering these aims, the court ruled "that allowing [the government] to reprosecute Arterbury is not fundamentally unfair to defendant." *Id.* at 1204. For that reason, the court declined to enforce its earlier suppression order.

On May 9, 2018, Arterbury entered a conditional plea agreement, reserving his ability to appeal the district court's order denying his motion to suppress. The district court accepted Arterbury's guilty plea and imposed a sentence of thirty-seven months of imprisonment, to be followed by five years of supervised release. Free on bond, Arterbury has timely appealed.

## DISCUSSION

The district court erred in denying Arterbury's second motion to suppress and not enforcing its original order suppressing evidence. Arterbury established the elements of federal criminal collateral estoppel under the common law. That showing sufficed, without any need to consider due process, to bar the government from relitigating the district court's original suppression ruling.

## I. Collateral Estoppel in Criminal Cases

### A. Federal Common-Law Collateral Estoppel

In *Ashe v. Swenson*, 397 U.S. 436, 443 (1970), the Court observed that "[a]lthough first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law at least since this Court's decision more than 50 years ago in *United States v. Oppenheimer*, 242 U.S. 85 [(1916)]." In *Oppenheimer*, the Court applied collateral estoppel without relying on any constitutional provision. 242 U.S. at 87–88. Because jeopardy had not attached

10

before dismissal of the first prosecution, the Double Jeopardy Clause did not apply. *Id.* at 86–87. And because the Court did not rule on due-process grounds, *id.* at 87–88, the Court must have dismissed the second prosecution based on federal common-law collateral estoppel. *See Loera v. United States*, 714 F.3d 1025, 1029 (7th Cir. 2013) (noting that collateral estoppel applies outside of double jeopardy as a common-law principle—as "very much a common law subject" (internal quotation marks omitted) (quoting 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4403, p. 35 (2d ed. 2002))); *see also* Note, *supra*, at 1729 (noting that "criminal collateral estoppel has deep roots in British common law that survived in federal common law"). Though the Double Jeopardy Clause incorporates collateral-estoppel principles, its doing so does not abrogate federal common-law collateral estoppel.

## B. Collateral Estoppel and the Fifth Amendment's Double Jeopardy Clause

In reviewing *state* convictions in federal court, it matters greatly whether collateral estoppel is incorporated into a federal constitutional provision. For instance, in *Ashe*, the Court reviewed a Missouri conviction of a man first prosecuted and acquitted in state court of robbing certain players in a poker game, but later reprosecuted and convicted of robbing a different player at the same game. 397 U.S. at 437–40. The Court struck down the state conviction under the Double Jeopardy Clause, ruling that collateral estoppel barred the state from relitigating whether the defendant had participated in the armed robbery. *Id.* at 445–46. Over the years, the

11

Court has continued to shape the double-jeopardy doctrine in cases involving counts for which juries convicted, acquitted, and hung.[3] But these cases are not in play for Arterbury's case—everyone agrees that jeopardy never attached during his original prosecution.

## C.      Collateral Estoppel and the Fifth Amendment's Due Process Clause

In cases not implicating the Double Jeopardy Clause, some courts have considered the possibility of incorporating collateral-estoppel principles into the Due Process Clause. Any such analysis begins with *Oppenheimer*. As noted, that case, with Justice Holmes writing, relied on common-law collateral estoppel, but the Court hinted that the Due Process Clause might reach collateral-estoppel questions. *See* 242 U.S. at 87. In response to the government's position that collateral estoppel extended no further than the Double Jeopardy Clause, the Court said this: "It cannot be that the

---

[3] *See, e.g.*, *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 356–57 (2016) (addressing the preclusive effect of acquitted counts when inconsistent convicted counts were later vacated on appeal on grounds unrelated to the inconsistency); *Yeager v. United States*, 557 U.S. 110, 122 (2009) (addressing the preclusive effect of acquitted fraud counts on hung insider-trading counts with interrelated facts); *Dowling v. United States*, 493 U.S. 342, 348–50 (1990) (addressing the preclusive effect of facts involved in acquittal of an earlier prosecution for a different offense, when used under Federal Rule of Evidence 404(b), and whether the defendant demonstrated that the jury earlier acquitting him necessarily resolved the Rule 404(b) evidence in his favor, that is, that he was not one of the men who entered the victim's home.); *United States v. Powell*, 469 U.S. 57, 68 (1984) (declining to apply collateral estoppel from acquitted counts when guilty counts are rationally irreconcilable); *Richardson v. United States*, 468 U.S. 317, 318–19, 324–25 (1984) (addressing the preclusive effect of two drug counts on which the jury hung in combination with an acquittal on a third drug count); *Harris v. Washington*, 404 U.S. 55, 55–57 (1971) (per curiam) (addressing the preclusive effect of an acquittal in a deadly bombing against family members in a second prosecution for the death of another family member not included in the first prosecution).

safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt." *Id.* Because the first prosecution had ended with a judgment of acquittal (based on an application of the statute of limitations later rejected in a different case), the Court barred the second prosecution. *Id.* The Court concluded its opinion with these words: "But the 5th Amendment was not intended to do away with what in the civil law is a fundamental principle of justice [citation omitted] in order, when a man once has been acquitted on the merits, to enable the government to prosecute him a second time." *Id.* at 88.

The next significant decision concerning due process and collateral estoppel was *DiGiangiemo*, 528 F.2d 1262. This decision, written by Judge Friendly, concerned a first state prosecution for which jeopardy had not attached (as here, the government dismissed its case after losing a suppression ruling), followed by a second prosecution and conviction. *Id.* at 1265, 1271. In this circumstance, the court remarked that it was "back to the question which the Court left unanswered in *Hoag* [*v. New Jersey*, 356 U.S. 464 (1958)], namely, how far due process, unaided by the double jeopardy clause, requires a *state* to apply collateral estoppel in favor of a criminal defendant." *Id.* at 1265 (emphasis added). Turning to *Oppenheimer* for help, the court noted that though there "it was unnecessary to determine . . . whether application of collateral estoppel on behalf of a criminal defendant was constitutionally required, overly sensitive ears are not needed to detect due process overtones in Mr. Justice Holmes' statement." *Id.* at 1265–66. Even so, because the

13

defendant had not preserved the collateral-estoppel issue in state court, the court deemed it waived and did not decide the due-process question. *Id.* at 1266–67, 1270.

A third opinion often cited on the due-process effect on criminal collateral estoppel is *United States v. Evans*, 655 F. Supp. 243 (E.D. La. 1987). In that case, a woman was first prosecuted in federal court in Connecticut and prevailed in suppressing certain evidence. *Id.* at 243. She later was charged with a different crime in federal court in Louisiana, in which the government sought admission of the earlier suppressed evidence. *Id.* at 243–44. Even though that case involved two *federal* prosecutions, the court analyzed the collateral-estoppel issue on due-process grounds, not simply as a matter of federal common law. *Id.* at 244 (reasoning that "collateral estoppel is doctrinally involved with notions of due process, as well as double jeopardy"). Relying on *DiGiangiemo*, the court held that the government was collaterally estopped on due-process grounds from relitigating the suppression ruling in the Louisiana court.[4] *Id.* at 244–45.

## II.    Arterbury's Case

In *Ashe*, the Court noted that collateral estoppel "stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that

---

[4] The government contends that *Evans* is not good law even in its circuit. It cites *Showery v. Samaniego*, 814 F.2d 200, 203 (5th Cir. 1987), for the proposition that "[w]e are unpersuaded, however, by [the defendant's] attempts to erect a due process basis, independent of the double jeopardy clause, for the application of collateral estoppel." Appellee's Br. at 24 (internal quotation marks omitted).

14

issue cannot again be litigated between the same parties in any future lawsuit."[5] 397 U.S. at 443. The Court further stated that "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Id.* at 444. To that end, collateral estoppel requires two showings before barring re-litigation of an issue: "(1) the issue to be precluded must have been actually and necessarily decided in the prior case, and (2) the party against whom collateral estoppel is invoked must have had a full and fair opportunity in the earlier case to litigate the issue to be precluded." *Willner v. Budig*, 848 F.2d 1032, 1034 (10th Cir. 1988) (per curiam) (citing *Ten Mile Indus. Park v. W. Plains Serv. Corp.*, 810 F.2d 1518, 1523 (10th Cir. 1987)). A "full and fair opportunity" to litigate the issue includes: (1) "that the parties were fully heard," (2) "that the court supported its decision with a reasoned opinion," and (3) "that the decision was subject to appeal or was in fact reviewed on appeal." *DiGiangiemo*, 528 F.2d at 1265 (internal quotation marks and citation omitted). We look to these factors to determine if the government is precluded from relitigating the suppression motion.

Arterbury has satisfied all these requirements. In 2016, the district court decided the suppression issue after full briefing and argument by the parties. And after the court suppressed the evidence, the government not only had an opportunity

---

[5] *See also Willner v. Budig*, 848 F.2d 1032, 1034 (10th Cir. 1988) (per curiam) (noting that collateral estoppel bars "the relitigation of factual or legal issues that were decided in a previous case").

15

to appeal, it did so. For its own reasons, it chose to dismiss its appeal without briefing it. Having failed to obtain a ruling on appeal, the government now argues that Arterbury has not shown that his earlier prosecution was finally adjudicated—because the district court dismissed the case without prejudice.[6]

Regarding the finality requirement, we turn to *Loera*, 714 F.3d at 1029. In that case, Judge Posner noted that in *DiGiangiemo* "Judge Friendly had pointed out the paradoxical effects of being picky about the finality of the judgment sought to be used as collateral estoppel." *Id.* (citing 528 F.2d at 1265–66). Contrasting two situations in which the trial court had granted a suppression motion—one before trial, the other after it had begun—Judge Posner declared that "[t]he difference in the stage of the proceeding at which the judge ruled shouldn't affect whether the issue can be revisited in the second proceeding." *Id.* at 1030. He concluded by noting that "[f]or these purposes, then, the dismissal of the first indictment should be treated as if it were a final judgment and the evidentiary ruling that the judge made in that first proceeding should be given collateral estoppel effect." *Id.* We agree with this reasoning.[7]

---

[6] The district court mixed the suppression issue with whether the government could re-prosecute Arterbury. *Arterbury II*, 322 F. Supp. 3d at 1204.

[7] *See also B. Willis, C.P.A., Inc. v. BNSF Ry. Corp.*, 531 F.3d 1282, 1301 (10th Cir. 2008) ("To invoke issue preclusion, there need not be a prior adjudication on the merits (as is often the case with res judicata) but only a final determination of a material issue common to both cases." (internal quotation marks and citation quotation omitted)); 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4434 (3d ed., Apr. 2020 update) (noting "[r]ecent decisions have relaxed traditional views of the finality requirement by

16

For collateral-estoppel purposes, we note that the government had every reason to appeal the unfavorable suppression ruling in Mr. Arterbury's case. The suppression order sounded the death knell for the government's case—simply put, no child-pornography evidence, no prosecution. And as a leading commentator puts it, "[i]n those jurisdictions where the prosecution may take an interlocutory appeal, it is quite proper to view the failure to appeal as rendering the pretrial order a final determination . . . so that the order would be binding even in the event of a dismissal and reinstitution of the charges." 6 Wayne R. LaFave, Search and Seizure § 11.2(f) (5th ed., Oct. 2018 update) (internal quotation marks and citations omitted). Along the same line, this commentator notes that "if interlocutory appeal is available to the prosecution but not exercised in a particular case, then surely the prosecution should not be able to raise with the trial judge those objections to the pretrial ruling he could have raised by appeal." *Id.* (footnote omitted).

Because Arterbury was prosecuted in federal court, he can rely on collateral estoppel under the federal common law. The district court erred in limiting Arterbury's collateral-estoppel claim to a "due process-oriented, federal rule of criminal collateral estoppel." *Arterbury II*, 322 F. Supp. 3d at 1203. Though the Fifth Amendment's Double Jeopardy Clause incorporates collateral-estoppel principles, it does not do so at the expense of federal common-law collateral estoppel. Instead, it

---

applying issue preclusion to . . . determinations of liability that have not yet been completed by an award of damages or other relief," particularly when the issue has been resolved "by appeal prior to final judgment").

17

permits a state defendant a federal constitutional challenge in a federal court. *See Smith v. Dinwiddie*, 510 F.3d 1180, 1187 (10th Cir. 2007) (noting that "state courts are constitutionally required to apply principles of collateral estoppel in criminal cases if and only if the protections of the Double Jeopardy Clause have been triggered"). Whether this court or the Supreme Court ever holds that the Due Process Clause incorporates collateral-estoppel principles—an issue we need not and do not reach today—collateral estoppel under federal common-law collateral estoppel will remain available to federal defendants.

We conclude that the district court erred by imposing due-process conditions on Arterbury's common-law collateral-estoppel defense. When Arterbury established the elements of collateral estoppel (and asserted it defensively, of course), the district court was obliged to enforce its earlier suppression order. *See Bravo-Fernandez v. United States*, 137 S. Ct. 352, 356 (2016) ("In criminal prosecutions, as in civil litigation, the issue-preclusion principle means that 'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" (quoting *Ashe*, 397 U.S. at 443)). Though a due-process right may affect future cases involving convicted state defendants unable to rely on federal common-law criminal collateral estoppel, Arterbury may rely on this defense as a convicted federal defendant.

For these reasons, we conclude that the district court abused its discretion in not enforcing its earlier suppression order.

**III.** *The change-in-law exception to collateral estoppel does not apply here.*

In arguing for affirmance, the government asserts that we can resolve this case by applying a change-in-law exception—even if collateral estoppel applies here. In short, it argues that "*Workman* changed the relevant law." Appellee's Br. at 19. But as in the district court, the government has supplied no authority applying the change-in-law exception to criminal collateral estoppel. And even assuming for argument's sake that the change-in-law exception does apply to criminal collateral estoppel, the exception would not apply here.

Under the civil-law variant of the issue-preclusion doctrine, the change-in-law exception allows a party to relitigate a previously decided issue when the "controlling facts or legal principles have changed significantly since" the judgment was issued. *Montana*, 440 U.S. at 155; *see also Comm'r v. Sunnen*, 333 U.S. 591, 600 (1948) (collateral estoppel applies only when "the controlling facts and applicable legal rules remain unchanged"). The government claims that *Workman* changed the law and thus it is permitted to relitigate the suppression issue.

Any discussion of a change-in-law exception to criminal collateral estoppel requires an answer to a preliminary question—what suffices as the "law" later changed? At oral argument, the government asserted that the "law" is the district court's 2016 ruling that the *Leon* good-faith exception does not apply here. As the "changed law," the government relies on *Workman*. This argument fails for two independent reasons.

19

First, the district court's 2016 ruling did not establish Tenth Circuit law. The government provides no authority supporting its position that a district court can set the "law" for change-of-law purposes. Instead, *Workman* set the circuit law. To present a viable change-of-law claim, the government would need a different situation. For instance, again even assuming the exception applies in criminal cases, the government might prevail if it had pursued its *Arterbury* interlocutory appeal to a defeat, only to have a *Workman* en banc court go the other direction. The government offers nothing of the sort.

Second, *Workman* did not change the law. As *Workman* itself noted, it reached its result by applying principles from established Supreme Court cases. In *Workman*, we concluded that "the *Leon* exception applies even if the magistrate judge had exceeded geographic constraints in issuing the warrant," rejecting Mr. Workman's competing argument as foreclosed by Supreme Court precedent. 863 F.3d at 1318 (citations omitted); *see id.* at 1319 (relying on Supreme Court precedent in *Herring*, 555 U.S. at 137, where the Court applied the *Leon* good-faith exception when a "third party stated that an outstanding warrant existed even though it had been recalled," and *Arizona*, 514 U.S. at 4, where the Court similarly applied the *Leon* exception when a "third party programmed information into a computer stating that a warrant had remained even though it hadn't").

*Workman* did not change any governing legal principles—it applied long-established ones.

**CONCLUSION**

For these reasons, we reverse and remand to the district court with instructions that it enforce its previously decided suppression order and proceed with the case.